```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 08-20851-CRIMINAL-LENARD
 3

 4    UNITED STATES OF AMERICA,          Miami, Florida

 5               Plaintiff,              February 19, 2010

 6          vs.

 7    SCARLET DUARTE,                    2:46 p.m. to 5:28 p.m.

 8               Defendant.              Pages 1 to 82

 9    _____

10

                          SENTENCING HEARING
11              BEFORE THE HONORABLE JOAN A. LENARD,
                     UNITED STATES DISTRICT JUDGE
12

13
      APPEARANCES:
14

15    FOR THE GOVERNMENT:        MARC OSBORNE, ESQ.
                                 ASSISTANT UNITED STATES ATTORNEY
16                               99 Northeast Fourth Street
                                 Miami, Florida 33132
17

18    FOR THE DEFENDANT:         NELSON RODRIGUEZ-VARELA, ESQ.
                                 Two Alhambra Plaza, Suite 112
19                               Coral Gables, Florida 33134

20
      FOR US PROBATION:          MICHELLE BURGESS
21

22    REPORTED BY:               LISA EDWARDS, CRR, RMR
                                 Official Court Reporter
23                               400 North Miami Avenue
                                 Twelfth Floor
24                               Miami, Florida 33128
                                 (305) 523-5499
25
```

```
 1            THE COURT:  Good afternoon.  You may be seated.

 2            United States of America versus Scarlet Duarte, Case

 3   No. 08-20851.

 4            Good afternoon, counsel and Probation.

 5            State your appearances, please, for the record.

 6            MR. OSBORNE:  Good afternoon, your Honor.

 7            Marc Osborne on behalf of the United States.

 8            THE COURT:  Good afternoon.

 9            MR. RODRIGUEZ-VARELA:  Good afternoon, your Honor.

10            Nelson Rodriguez-Varela on behalf of Scarlet Duarte,

11   who is present before the Court.

12            THE COURT:  Good afternoon.

13            THE PROBATION OFFICER:  Good afternoon, your Honor.

14            Michelle Burgess on behalf of United States

15   Probation.

16            THE COURT:  Good afternoon.

17            Ms. Duarte is set for sentencing today.

18            Ms. Duarte, have you read the revised advisory

19   presentence investigation report and its addendums?

20            THE DEFENDANT:  Yes, I have.

21            THE COURT:  And have you and your attorney discussed

22   the revised advisory presentence investigation report and its

23   addendums?

24            THE DEFENDANT:  Yes, we have.

25            THE COURT:  Now, prior counsel had filed objections
```

1    to the -- well, he filed objections on November 30th to the

2    original report and then filed a supplement to the Defendant's

3    objections on December 8th.

4          The Government filed a response and a motion for

5    upward departure.

6          Are you still proceeding on those objections --

7          MR. RODRIGUEZ-VARELA:  Yes, Judge.

8          THE COURT:  -- Mr. Rodriguez-Varela.

9          MR. RODRIGUEZ-VARELA:  Yes, I am.

10         THE COURT:  Okay.  So you wish to be heard?

11         MR. RODRIGUEZ-VARELA:  Thank you, your Honor.

12         Judge, you heard the trial.  You know what the facts

13   are on the case, what the witnesses said, how they testified.

14   And, obviously, every appellate level seems to think that the

15   Court is in the best position to gauge credibility.

16         At this point, we accept, obviously, the verdict that

17   was given by the jury in this case.

18         There are certain things that we'd like to challenge

19   in terms of the computation of the sentence, which at this

20   point puts the Defendant at a Level 28, which -- it's basically

21   78 to 97 months.

22         The first level -- the first point that the PSI makes

23   here is the base offense level.  The base offense level is

24   calculated here based upon the value of the monetary funds

25   being in excess of $400,000, but not more than a million

1    dollars.

2          The indictment that was returned by the grand jury in

3    this case alleges for purposes of determining the counts -- and

4    let me just backtrack.

5          There are certain companies that give rise to the

6    amount of relevant conduct in this case.  One is SND.  The

7    other one is Falcon Transport.  The other one is known as

8    24-Hour.  And the other one is known as MD Billing.

9          Each of these companies, your Honor, is alleged to

10   have received funds from a company that was committing Medicare

11   fraud.  From those companies, checks were issued in order for

12   them to be cashed.

13         The checks were made out to different individuals.

14   Different individuals cashed those checks.  The money came back

15   and it was given to an individual by the name of Sotto.

16         Now, obviously, the Court understands -- and I'm not

17   going to dwell too much on this -- the Defendant did not have

18   absolutely anything to do with the scheme that gave rise to the

19   actual theft of money from Medicare.

20         She didn't set up the clinics.  She did not operate

21   the clinics.  She did not create any entity whatsoever in order

22   to commit that fraud.

23         Her portion of the involvement in this particular

24   case, we would submit -- it's all one conspiracy.  We would

25   suggest that her part is only in these companies and the

1   monetary funds that were -- that transit through these

2   companies.

3           Now, the first one, being SND -- an amount of 348,033

4   was the totality of the funds that went through SND.

5           Now, if we recall the testimony that was given at

6   trial, SND was set up under the name of the Defendant, Scarlet

7   Duarte.  But it was set up by Diana Sotto.

8           Diana Sotto sent to the Department of State the

9   incorporation documents.  Diana Sotto was the one that had the

10  connection at La Bamba.  Because, if you recall, this company

11  did not even have a bank account.

12          This company is the company that would cash checks at

13  a check-cashing place called La Bamba, which it's very unusual

14  for a company not to have a bank account and to be cashing

15  checks at La Bamba.  But, nonetheless, that is exactly what

16  happened here.

17          So two checks are alleged in the indictment through

18  SND as to Defendant Scarlet Duarte.  One is Count 19 in the

19  amount of $40,000.  The other one is Count 20 in the amount of

20  $14,000.  Those are the two checks coming from either M&C or --

21  which is, of course, money that's coming from Project New Hope.

22          So those are the only two checks that Scarlet Duarte

23  really had anything to do with.  Because, if we look at the

24  testimony at the trial, every other check that came in through

25  that business that was cashed at La Bamba was negotiated by

1    Diana Sotto.

2              It was Diana Sotto's handwriting.  It was Diana

3    Sotto's endorsement.  It was Diana Sotto who received the bulk

4    of the money from that company.

5              Now, if Scarlet Duarte is allegedly receiving some

6    amount from cashing those checks at La Bamba and she has to do

7    at least tangentially with the 40,000 and the 14,000, it's

8    entirely understandable and quite possible that Ms. Sotto would

9    have Scarlet Duarte in the dark about what else is being

10   received through that company.

11             So it becomes an issue of foreseeability, whether it

12   is foreseeable for Scarlet Duarte to realize the amount of

13   money that is going through SND and going through the

14   check-cashing business at La Bamba.

15             Even in the case of the 40,000 and even in the case

16   of the 14,000, the testimony at trial was that it was not

17   Scarlet Duarte's handwriting, that it looked more like the

18   handwriting of Ms. Sotto.

19             Ms. Sotto is the person who has orchestrated and was

20   the architect of every single device that was used to launder

21   monetary proceeds from Project New Hope and their extensive

22   fraud committed against Medicare.

23             So while we accept the jury verdict, while we accept

24   that the Defendant was convicted of Counts 19 and 20, we would

25   submit that the rest of the money that came in through that

1    business was not known by Scarlet Duarte, was not negotiated by

2    Scarlet Duarte.  She did not partake or receive any benefit

3    from those monies that came in through SND.

4          And I think that, in order for us to make that

5    assessment, one of the important things that we should consider

6    is the testimony of Maria Loriga.

7          The testimony of Maria Loriga talks a little bit

8    about that in terms of how Scarlet Duarte came to have a role

9    in this otherwise extensive conspiracy without really having

10   very much knowledge about all of the factors that surrounded

11   it.

12         To use her words, indicating that Scarlet -- as

13   she -- she was using her on a way to get the money out.  And I

14   think that that is a lot of what happened in this case.  A lot

15   of what happened in this case -- before we come to court and

16   before people testify and before people put their foot in their

17   mouth when they take the stand, they make their own decisions.

18         Now, while she's making her own decisions, we have a

19   very savvy criminal, because Ms. Sotto knows how to steal the

20   money from the Medicare.  Ms. Sotto knows what codes to use.

21   Ms. Sotto knows how to advise the clinic owners as to what

22   Medicare is paying for.  And Ms. Sotto certainly knows how to

23   control the flow of money throughout.

24         She would have been in an excellent position, taking

25   advantage of the lack of knowledge -- lack of prior knowledge

 1   by the Defendant as to how those things are done and, in

 2   addition to that, taking advantage of a purported friendship,

 3   putting Scarlet Duarte in a position where she may be acting

 4   consistent with the objectives of the conspiracy, yet not

 5   knowing all the details.  And I think that, more than anything,

 6   she was used in a way to get the money out.

 7          Now, if you think about it, who's the one that has

 8   the most exposure here in terms of being able to determine who

 9   was laundering the money?  Scarlet Duarte.  She's the one

10   that's writing the checks.  She's the one that's receiving the

11   money.  She's the one that's turning over the money to

12   Ms. Sotto.  She is the one that almost anybody can use to do

13   that job.

14          Now, the smart ones stay away from that trade.  The

15   smart ones are on the margin -- on the side, waiting to receive

16   that cash from a person like Scarlet Duarte, an

17   unsophisticated, unknowing, trusting individual, and waiting

18   for that money to come back into their grubby hands.

19          They're the ones that are engaged in the fraud.

20   They're the ones that are getting the lion's share of the

21   funds.  And more than anything, your Honor, they are the ones

22   that are going to be less likely to want to share those

23   proceeds whenever appropriate.

24          That's why Scarlet Duarte thinks that that company

25   was not generating any funds, that it wasn't working anymore,

1    that it wasn't receiving any money and, basically, that it was

2    dormant and that it would expire at the end of the year because

3    of lack of any kind of movement or business, if you will.

4            So insofar as our challenge to that, we believe,

5    based on those factors, that the amount of money that was

6    received through SND beyond the 40 and the 14 in Counts 19 and

7    20 would not have been foreseeable to Scarlet Duarte, given the

8    manner in which Ms. Sotto set up this entire scheme.

9            So if we believe that, then the Defendant would not

10   be at an offense level of 22.  She would be at an offense level

11   of 20, because she would be below the 400,000-dollar

12   requirement that is Level 22.

13           I don't know if you want me to proceed through all my

14   objections or you want me to go one by one.  However the Court

15   wants me to do it.

16           THE COURT:  Go ahead.  Keep going.

17           MR. RODRIGUEZ-VARELA:  Okay.  The next issue, your

18   Honor, that I'd like to address is the issue of sophisticated

19   laundering.  And the issue of sophisticated laundering is

20   governed by 2S1.1, right -- 2S1.1(b)(3)?

21           The way that the laundering was set up in this case

22   is almost like if a child would have done it.  The idea of

23   going to a check-cashing place to cash checks from a

24   business -- now, remember that Scarlet doesn't set up these

25   transactions.

1          Now, while she may have participated in a manner that

2     is consistent with some of those objectives as it is read in

3     the instruction of conspiracy, it was -- she was basically put

4     in a position where, "I have created these things for you and

5     this is how you're going to run it.  And, eventually, you're

6     going to have your own business and you're going to make your

7     money and you're going to be in the same position as me."

8          And, if you think about it, look at the relative

9     position of the parties.  Scarlet Duarte doesn't even have

10    money to buy the uniforms for her kids for school and, on the

11    other hand, Ms. Sotto drives the great car, lives in the big

12    house and has all the money.

13         So she's going with what Ms. Sotto is telling her,

14    saying, "Look, this is how we're doing it.  This is my

15    business.  This is how you get started.  This is how you do it.

16    This is what I want you to do."  And she is acting in a manner

17    that is consistent with that.

18         But in terms of sophisticated laundering, you have a

19    person that, at most, created a company so that checks could be

20    received and checks could be written and cashed.

21         I mean, the business is not investing in futures.

22    The business is not investing in real estate transactions.

23    They're not involved in any kind of credible conduct to

24    demonstrate and hide funds that were coming from an illicit

25    purpose.

1              Rather, they're getting the idiot here to go cash

2    checks, to write checks to her friends so that they could go

3    cash them God knows where, come back, "Here's the money" and

4    she turns around and gives the money to Sotto.

5              How sophisticated is that?  That is the most

6    ridiculous way and the easiest way to be caught doing something

7    illegal, which is exactly what happened in this case.

8              It wasn't very hard for the FBI to come and knock on

9    her door and say, "Hey, Scarlet," you know, all these checks,

10   because her hand is all over them.  It was done almost in a

11   thoughtless way.  It was done by someone who has no idea what

12   she's doing.

13             It is so ridiculously easy to catch Scarlet Duarte

14   that all they had to do was track down the money and ask her

15   what she thought that money was coming from.  Where do you

16   think that money is coming from?

17             And that is her biggest problem in this case, the

18   issue of deliberate ignorance and the things that happened

19   during the trial, which we'll address in a minute, but has

20   nothing to do with that.

21             I think -- and I think it is the case law -- when the

22   Sentencing Commission created a two-point enhancement for

23   sophisticated laundering under (b)(3), they envisioned people

24   acting as businessmen who created entities that truly would

25   disguise the source of the funds, not merely serve as a cashing

1   house, as a punk writing checks where she's easily going to be

2   caught in every way without any question that, when they come

3   knocking on the door, it's going to be easy to see Project New

4   Hope, to account so-and-so.

5         "Let me see account" -- so-and-so.  Oh, Scarlet

6   Duarte.  "Scarlet, these checks to your friends, cashing the

7   money.  Here's the money."  The money goes to the other -- it's

8   like a child did it.  There's nothing sophisticated about it.

9         The Court has been sitting as a judge for a very long

10  time.  The Court has seen some of the very, very complicated

11  transactions and lengths that people go through to launder

12  large amounts of monetary proceeds, the use of offshore

13  accounts, the use of -- businesses transacting business in

14  Malaysia, an individual bringing a suitcase full of money that

15  later ends up being invested in New York in some stock fraud,

16  things that are -- that even when seasoned investigators look

17  at them they say, "You know, it has gone through so many

18  levels" -- "levels" being the operative word that is being used

19  here, two or more levels, layering of transactions -- "It has

20  gone through so many layers that not even we can tell whether

21  the guy that took this money and wrote that check knew that the

22  money came from an unlawful purpose."

23        And that's what I have to say about sophisticated

24  laundering.

25        I think that she was basically -- as her prior

1    counsel said, it was not designed by Scarlet Duarte.  Nothing

2    in the scheme protected her.  To the contrary, the scheme was

3    designed to hang Scarlet Duarte out to dry.

4         They didn't bother to create different layers.  They

5    said, "You know what?  We're going to do it the easy way so I

6    can get my money in my pocket fast.  If they get caught, do you

7    know who they're going to go to?  Scarlet Duarte.  I'm going to

8    wash my hands and probably even convince the idiot here to go

9    and testify in my motion for new trial.  I will use her to help

10   me and I will clean my hands with her."

11        And that's exactly what they did in this case.

12   That's why we're looking at Scarlet Duarte here, looking almost

13   at the same amount of time as the leaders of this conspiracy,

14   which really should not be.  But, hey, when you go to trial and

15   you lose, anything is possible with the guidelines.

16        I'm not going to ask the Court to award acceptance of

17   responsibility here because, you know -- and I want to address

18   the issue of acceptance not because I'm asking you for

19   acceptance, but I want you to consider it in the context of

20   obstruction.

21        And I want the Court to also consider the issue

22   pertaining to whether the Defendant should have testified or

23   not, whether the Defendant in this case testified pursuant to

24   some crazy idea that the instruction of deliberate ignorance

25   would help her.

1           I think that that is something that has something to

2    do with this case and this sentencing this afternoon and has a

3    lot to do with a potential claim of ineffective assistance of

4    counsel.

5           I have never seen -- and I'm not saying that all

6    circumstances would prevent a defense attorney from saying it

7    because, frankly, I haven't looked at every possible situation

8    in the world.

9           But when we look at what happened in this case and

10   the fact that the defense attorney himself is requesting a

11   deliberate ignorance instruction, one would have to consider to

12   ask for a deliberate ignorance instruction in light of the

13   testimony that the Defendant gave.

14          And what did the Defendant say?  The Defendant said

15   that, basically, she didn't know what was going on with the way

16   that the money was being received.

17          And I don't think that anybody here said that Scarlet

18   had anything to do whatsoever with the procurement of the funds

19   from the Medicare system.  That was done by smart people, not

20   by Scarlet Duarte.

21          Then Scarlet takes the stand and -- and when we look

22   at the testimony of some of the other people, they're saying,

23   "Well, yeah.  She was present."

24          When some checks were given, she didn't negotiate the

25   checks because the handwriting isn't hers, you know, the

1    idiotic idea of Falcon Transport and 24-Hour, which we admit

2    that that is part of her relevant conduct.

3           But when we look at whether she obstructed justice by

4    her testimony and what she said, she basically admitted to a

5    crime on the stand.

6           She admitted to closing her eyes.  She admitted to

7    doing things that, if -- if anybody would have even said, "Let

8    me just ask one question.  Let me go to the bank -- let me look

9    at this.  Where are you getting all this money?" -- just one

10   question, just a very minor, "Let me look over your shoulder.

11   Let me see why you're doing all these things," you would have

12   realized that she is being deliberately ignorant.

13          And that is what she testified to.  Her testimony is

14   consistent and is the picture of deliberate ignorance.  And

15   then her attorney at the end of the case says, "Judge, give me

16   the deliberate ignorance instruction."

17          I cannot imagine under what circumstances a defense

18   attorney would come in and put their client on the stand after

19   having given a statement to the FBI in 2006, after having

20   testified on a motion for new trial of a Co-Defendant and after

21   considering the evidence -- the overwhelming evidence in this

22   case -- would have put her on the stand to admit that she

23   should have looked and that she looked the other way and that

24   she closed her eyes and then asked for deliberate ignorance.

25          It makes absolutely no sense in light of what she

1    testified.

2           And there's over 100 and somewhat pages of her

3    testimony that I went through a couple of times, looking at it

4    and thinking:  How in the world would this testimony help

5    Ms. Duarte be acquitted in a case where she's essentially

6    admitting the theory of the case is, "Let me admit to

7    deliberate ignorance.  Let me get the instruction.  And then

8    let's see what happens"?  That is crazy.

9           Not only did the Government have direct proof to

10   convict this woman, but she also helped them with her attorney

11   to convict her by saying, "You know what?  I should have

12   looked.  I should have known."

13          You know, she had no answers, Judge.  Most of the

14   time, she had no answers.

15          "What about the 40,000-dollar invoice?

16          "Oh, I don't remember.

17          "Well, what about this check?

18          "I don't remember.

19          "Well, what about this meeting?

20          "I don't know."

21          She had no business taking the stand.  She had no

22   business being in this trial with the amount of evidence that

23   we're looking at here.

24          And let me not bore you with more, but let me suggest

25   to you that the strategy was flawed, that her testimony was

1    guided by that strategy that made no sense whatsoever and that

2    her testimony in this case, rather than being obstruction of

3    justice, is almost a mindless admission to the counts alleged

4    in the indictment.

5           And once she finished testifying, the jury shouldn't

6    have taken more than 25 minutes in coming back with a verdict

7    of guilty against this woman based upon the things that she

8    said on the stand.

9           Her testimony was almost like saying, "You know, I

10   want the jury to acquit me because I'm stupid.  I want the jury

11   to acquit me because, you know what?  I looked the other way

12   and I really didn't know that," when you know that the law is

13   that you have to look, that you have to think, that you have to

14   go forward.

15          And she didn't because she's not the brightest apple

16   in the bunch.  She didn't because, quite frankly, she let

17   themself -- herself be led by a poisonous snake that is this

18   woman, Ms. Sotto, who even had the ability, Judge, to get

19   her -- and it's the transcript that I asked you to reset the

20   hearing because -- oh, I got it from counsel and I read it, not

21   as much as I'd like to read it, but I read it quickly, since I

22   got it this morning.

23          And I -- you know, she -- Sotto -- in the middle of

24   this firestorm with the FBI, with the Department of Justice,

25   with an indictment looming, she convinces Scarlet to come and

1    testify in her favor at her motion for new trial.  That is

2    crazy.  It is amazing, the control that this woman has over

3    Scarlet Duarte.

4          I cannot imagine any circumstances where somebody

5    would do something like that, except to say, "You're either

6    stupid or you love this woman for some reason or you're really

7    putting your head in the sand and you don't want to look

8    anywhere beyond just admitting, 'Oh, I trusted her.'

9          "And why did you do --

10         "I trusted her.

11         "Why did you --

12         "Oh, I trusted her."

13         What is that?  That is a plea of guilty.

14         "Mr. Osborne, what can I do for you?  How can I be

15   truthful about this?  Let me sit with the Government and let me

16   do what I have to do" and not come in, admit your guilt, get

17   the instruction of deliberate ignorance and go to the jury.

18         I don't even know how long the jury took -- how long

19   did the jury take to come back?

20         THE DEFENDANT:  I think in an hour.

21         MR. RODRIGUEZ-VARELA:  An hour.  Of course.  Of

22   course.

23         And they must have taken an hour because they needed

24   to determine where they're going to sit, you know, if they're

25   going to have lunch, if they're going to drink water, if

1    they're going to select a foreperson.

2         You know, I bet they didn't even sit there.  You

3    don't even need to discuss this for an hour.  "She's guilty.

4    She told us.  And the lawyer helped.  Deliberate ignorance.

5    The lawyer's giving us the road map to the conviction of this

6    person."

7         So I don't think she committed obstruction of

8    justice.  I don't think she came forward and lied on the stand.

9    I think more than anything she gave the Government a little

10   help in convicting her.

11        And I think that, of course, I'm not going to say

12   that you should award her points for accepting responsibility

13   because she clearly didn't, but I don't think that this -- in

14   spite of that, I don't think that the Court should also give

15   her two points for obstruction of justice, which is, I would

16   imagine -- and I have seen it -- just basically reserved for

17   the worst of the worst that come in here and blatantly lie

18   about things.

19        I think -- if anything, I think she helped the

20   Government a great deal.

21        The testimony that she gave -- and just a side note:

22   The testimony that she gave with respect to Diana Sotto in her

23   motion for new trial that is accompanied by the order of the

24   Honorable Cecilia Altonaga -- and it's in addition to that part

25   of a very long -- lengthy transcript from Page 17 to

 1    Page 70-something -- to Page 66 -- I don't think that should be

 2    considered in this case.

 3            It was not part of the trial.  I used it by reference

 4    because it exacerbates the fact of the hold that this woman has

 5    over Scarlet Duarte and I think it should be considered for

 6    that purpose.

 7            I don't think it establishes that she committed

 8    perjury.  I don't think it establishes obstruction of justice.

 9    It didn't happen through the course of this trial.  It was not

10    testimony that was believed or relied upon by anybody.  It did

11    not alter in any way the result of anything in this case.

12            And I don't think that it should be the basis for a

13    finding of a two-point upward adjustment under 2S1.1(b)(3),

14    obstruction of justice -- I'm sorry -- 3C1.1, obstruction of

15    justice.  I misspoke, and I called again the guideline for

16    sophisticated means.

17            And, your Honor, again, you sat through the course of

18    this trial.  You know better than me what her demeanor was when

19    she testified.  You know, the things that she said are in the

20    transcript.  But sometimes, when people say things and you're

21    present and you see them, you gather other things.

22            You're observant.  You've been doing this for a lot

23    longer than me.

24            I think that -- if you look at all the factors in

25    this case, I think that, even if you don't find me persuasive

1    with regards to the Level 20 instead of the Level 22 for the

2    base offense level, certainly the enhancement for obstruction

3    and sophisticated means should not apply in this case.

4         That would be a four-point reduction -- six-point

5    reduction from the 28-point level that is alleged in the PSI.

6    It would then put her at a Level 22, and a Level 22 would be

7    somewhere in the neighborhood of 41 to 51 months.

8         You know, again, if I were to tell you where I think

9    that I am strongest, I think that I am strongest with regards

10   to my points made on sophisticated means and on obstruction of

11   justice.  I am less strong in terms of the foreseeability

12   issue, as to the first argument that I made.

13        If you find that, then, she would be at a Level 24,

14   and the applicable guideline range at a Level 24 would be 51 to

15   63 months, where I would ask you to find that she should be

16   sentenced at the low end, Level 24, 51 months.

17        In looking at the filings of my predecessor in this

18   case, there is a section that he calls "Nonguideline

19   Considerations."  And I don't know how you look at it.  I

20   thought of filing my motion for downward departure under the

21   guidelines.

22        I think that, when you talk about these nonguideline

23   considerations, it's a petition for -- basically, a petition

24   for downward departure, things that have to do with an

25   appropriate sentence, her personal and financial circumstances,

```
 1    imposing a sentence that is no longer than necessary to achieve

 2    the results of the -- of criminal sentencing.

 3            Without going into -- too much into that, the Court

 4    obviously always has the discretion to fashion a sentence that

 5    is appropriate under the circumstances of this case and the

 6    circumstances of any case.

 7            The Court can consider, obviously, personal --

 8            THE COURT:  I'd like to wait for the 3553(a) factors,

 9    if that's the argument you're going to make.

10            MR. RODRIGUEZ-VARELA:  Yes, your Honor.  Absolutely.

11    Thank you very much.  Then, I have nothing further.

12            THE COURT:  Mr. Osborne?

13            MR. RODRIGUEZ-VARELA:  I'm sorry, Mr. Osborne.

14            Is there water?

15            THE COURT SECURITY OFFICER:  Yes.

16            THE COURT:  Yes, Mr. Osborne.

17            MR. OSBORNE:  Thank you, your Honor.

18            First of all, with regard to the amount of the loss

19    that the Defendant is responsible for -- or, I guess, really,

20    it's, in the case of a laundering case, the amount of laundered

21    funds that are within the Defendant's relevant conduct.

22            In this case, we charged two checks that were cashed

23    by SND Medical Services, which I think that's the whole

24    dispute.

25            The defense, I understand, agrees that she foresaw --
```

 1   reasonably foresaw or knew about all the checks by the other

 2   two companies, Falcon Transport and 24-Hour.

 3          With regard to SND, we charged two checks.  I guess

 4   next time I should just charge them all, but maybe then it

 5   would seem like overkill.

 6          Of the two checks we charged, one of them, your

 7   Honor, was the check that we had this e-mail where she

 8   discussed creating a fake invoice with Ms. Sotto.  The other

 9   one was just another representative check, just like all the

10   other checks.  And the jury convicted her on both counts.

11          So although the defense argument, as I understand it,

12   is basically, since she got convicted of just two checks,

13   that's all that should be included in her relevant conduct,

14   that doesn't really make sense, given that the second check of

15   which she was convicted, the one in Count -- I'm getting the

16   numbers mixed up.  That's the one in Count 19.

17          The only thing I thought of afterwards, when I was

18   writing my response to the objections, was the fact that

19   Count 19 charged a check that was cashed after that e-mail was

20   written.

21          I realized that maybe I should have chosen another

22   representative check from an earlier point.  You know, we could

23   get the jury's opinion:  Did she learn about the laundering at

24   the time of that e-mail or had she already known or whatever?

25          But as I pointed out in my response, even if you

1    include in her relevant conduct only the money that was cashed

2    at La Bamba by SND after the date of that e-mail, even then,

3    the relevant conduct would come to slightly more than $400,000.

4            And, anyway, your Honor, as I pointed out, it's not

5    just a question of what did the jury necessarily find in

6    returning their verdict.  But, obviously, your Honor heard the

7    evidence for yourself.  And I submit the evidence showed that

8    Ms. Duarte knew what was going on.

9            She set up this company, as she admitted.  She

10   supposedly thought it was going to do business.  But she -- I

11   mean, there's no -- she had no idea of exactly how that was

12   going to work.

13           And she then said, "Well, then" -- you know, she went

14   and opened the La Bamba account, as she admitted.  But, again,

15   I submit, on cross-examination, she couldn't provide any

16   reasonable explanation for why she did that.

17           And, yet, with the other company, when she -- she

18   opened bank accounts for her other companies even before they

19   received any money.  That's what she said.  She thought SND

20   needed a La Bamba account in case they got any money before

21   they'd opened a bank account.

22           I submit her explanations were implausible, your

23   Honor, in addition to which the e-mail itself refers to

24   previous invoices.  I'm talking about the e-mail between

25   herself and Ms. Sotto, which was -- I attached it as Exhibit 1

1   to my response to the objections to the presentence report.  It

2   was also introduced at trial.

3           In that, Ms. Sotto asks her to create this fake

4   invoice and fax the other ones with this one.  So she

5   obviously -- I mean, you couldn't write a little four-line

6   e-mail like that if this was the first time that you'd ever

7   been explaining to Ms. Duarte that, "The company is actually

8   doing some business and we'd like you to create some fake

9   invoices."

10          This is obviously not the first time she's ever heard

11  about what SND is doing.  Yet, even if this were the first

12  time, as I pointed out, she'd still be responsible for more

13  than $400,000 in loss.

14          So I think that the range selected by the Probation

15  Office, between 400,000 and a million, is clearly the

16  appropriate range in this case, and that is the loss -- or the

17  laundering associated with this Defendant.

18          Now, the next question is whether the laundering

19  involved sophisticated means -- or, I guess, rather, if it's --

20  if it's sophisticated laundering, is the term.

21          Now, first, the defense arguments are focused only on

22  SND.  When they say, "Well, it's like a child would have done

23  it," they're talking entirely about the laundering at SND.

24          But the laundering -- if you start with the other

25  companies, it's extremely sophisticated, Falcon Transport and

```
 1    24-Hour Network Solutions.  She opened two other shell

 2    companies.  She gave them plausible kind of names, like she

 3    might be doing some kind of business or services for a clinic.

 4    In one case, she used a nominee owner.  She did not open it in

 5    her own name.

 6              She then, in some cases, withdrew the money in cash.

 7    In other cases, she recruited people to cash checks for her and

 8    wrote checks to those people, including notations on the check

 9    that would provide a plausible explanation for why the checks

10    had been written, things like commissions and things like that,

11    all of which was fake.

12              And in some cases, she wrote checks to other

13    companies, which she claimed in her testimony that that was

14    just at Ms. Sotto's direction.  But even if that's true -- and

15    I submit her testimony obviously wasn't credible to the jury.

16              But even if it were true that those other companies

17    to whom she wrote checks -- La Casa la Tina, I think, was the

18    biggest one -- even if that's true -- actually, I think that

19    may have been the only other company.  I think there were also

20    other individuals.

21              But even if it's true that those other ones were

22    Ms. Sotto's idea, still, she's writing checks to other

23    companies, other people, disguising the way the bank records

24    look.

25              I think it's actually telling when defense counsel
```

1    said that he's -- there's some cases where the laundering is so

2    sophisticated, involves so many layers, that at the end the FBI

3    has to say, "We can't decide whether the person who handled the

4    checks knew that the money came from an unlawful source."

5           But if that were the standard, sophisticated

6    laundering would only be when people were acquitted.  It's only

7    if it's sophisticated enough that you get away with it.  But

8    that's not the standard.

9           The guidelines specify, your Honor, that

10   sophisticated laundering typically involves the use of....  And

11   they list several possibilities:  Fictitious entities, shell

12   corporations, two or more layers of transactions or offshore

13   financial accounts.

14          There's no offshore accounts here, but there

15   certainly are shell corporations, three of them.  There

16   certainly are levels or layers of transactions, in other words,

17   getting the money to one corporation, writing it to other

18   people or other corporations and then taking it out and

19   returning it in cash.  There's also the use of Mr. Falcon as a

20   nominee owner.

21          Even SND -- actually, I have to disagree.  I'm not

22   sure it is such a childlike way to launder money.  Actually,

23   SND turned out to be their best laundering, your Honor.  Right?

24   They didn't have a bank account.  So we can't say whose

25   signature is on the account.

1          Ms. Duarte opened the company, but later she could

2     say she didn't know what it was going to do.  And they took

3     down the money to La Bamba.  There they got a little lucky.

4     La Bamba turned out to be so corrupt that we weren't able to

5     use its records at trial.  They'd already been convicted of

6     filing false currency transaction reports.

7          But, nevertheless, I don't think it was that bad a

8     scheme.  It actually worked pretty well.

9          But, anyway, you have to look at the whole

10    laundering, all three companies, not just the first one.  And

11    the other two were classic sophisticated laundering.  Even the

12    use of three different companies.

13         THE COURT:  What are the three companies?

14         MR. OSBORNE:  SND, Falcon Transport and 24-Hour

15    Network Solutions, your Honor.

16         Falcon Transport was the company that Mr. Falcon

17    acted as the straw owner of and where Ms. Duarte recruited her

18    friends from work to cash checks for her.

19         In 24-Hour Network Solutions, in addition to money

20    from Project New Hope, she deposited what may have been what

21    she says was her paychecks from the other billing company where

22    she worked and mixed the money in and then used some of it for

23    the personal expenses.

24         So I submit that it was sophisticated -- that the

25    laundering was sophisticated and that that enhancement is

 1    appropriate.

 2              Finally, there's the question of whether Ms. Duarte

 3    obstructed justice, your Honor.

 4              Now, Ms. Duarte obstructed justice on two occasions.

 5    The first was in front of Judge Altonaga at the motion for new

 6    trial in Ms. Sotto's case, and then the second was in front of

 7    your Honor at trial here.

 8              Let me start with the one you saw, which was when

 9    Ms. Duarte testified here.

10              Now, you know, the defense, I guess, is kind of that

11    it was a bad idea for her to take the stand, that her testimony

12    hurt her, she got bad advice, she shouldn't have taken the

13    stand; and, so, it's not obstruction of justice.

14              It's still obstruction of justice if she took the

15    stand and perjured herself.  That's what the obstruction of

16    justice is.

17              And there's no question, as I point out in multiple

18    instances in my response to the objections, your Honor, that

19    Ms. Duarte perjured herself.

20              In the first place, even just narrowly focusing on

21    the question of whether Ms. Duarte admitted guilt in the sense

22    of admitting that she closed her eyes or that she was

23    deliberately ignorant, it's just not the case that she admitted

24    that.

25              I certainly agree -- I got up in my closing and I

1   said to the jury her testimony was false, it was not

2   believable, it helped the Government.  I agree her testimony

3   helped the Government in that sense, but that's not the same

4   thing as to say that she actively admitted her guilt.

5           For one thing, let's separate out her direct

6   examination from her cross-examination, because it was on

7   cross-examination, your Honor, that, at some points, she came

8   close to agreeing that she had done some things that, I guess,

9   at least arguably, could be deliberate ignorance, for example,

10  when she used the phrase that she closed her eyes.

11          But she then explained she didn't mean that she

12  closed her eyes to any suspicious circumstances.  What she

13  meant was she closed her eyes to the details of how the company

14  was going to be run, that they didn't concern her.

15          So that phrase -- that was a little slip of hers that

16  I'm sure didn't help her when the jury was deliberating.  But

17  it's not the same thing as admitting her guilt.  On the

18  contrary, Mr. Norris in closing arguments argued that she had

19  not admitted her guilt.

20          I certainly didn't suggest to the jury, "Well, if you

21  even take her own word for it, she'd be guilty.  On the

22  contrary, I argued strenuously that her testimony had been

23  false.  And it was false, your Honor.

24          There are numerous examples which I cite -- or refer

25  to and discuss in my pleading where she testified falsely.

 1              First, I point out that her explanation for why she

 2    opened an account at La Bamba on behalf of SND, namely, her

 3    idea that this was a normal way of doing business in order to

 4    get -- in order, when she got her first payment, she could cash

 5    it at La Bamba before -- if she didn't have a bank account yet,

 6    that that didn't make any sense, that that is not a credible

 7    explanation for why she would open a La Bamba account.

 8              And, indeed, at Falcon Transport and 24-Hour, she did

 9    open a bank account and deposit checks in it.  She opened the

10    account with her first check.

11              She also -- I pointed out, when she was asked whether

12    she had been present when Ms. Sotto had asked Mr. Falcon to

13    open Falcon Transport, her answer was evasive.  She could not

14    clearly state whether she had been present or not or what had

15    happened.

16              That's in contrast, actually, to her earlier

17    testimony in front of Judge Altonaga, where she claimed she had

18    been present for that event.

19              Again, you heard her testimony, your Honor.  I mean,

20    when I say it was evasive, I just -- I have to rely on your

21    memory whether you agree with me or not that she was evasive on

22    that point.

23              I also actually pointed out she claimed that she'd

24    been reprimanded at every job she'd ever had for responding to

25    e-mails without reading them, but she couldn't name any

1   supervisors at any recent jobs, anybody that we might have been

2   able to find.

3        I pointed out that she claimed that she believed

4   Ms. Sotto that Ms. Sotto intended Francisco Falcon to open up

5   Falcon Transport as a legitimate business, that she believed

6   that he intended -- this man -- to open up a business and

7   transport patients, although he was unemployed, had no van and

8   had no experience in that area.  He was a maintenance man.

9        She also testified, your Honor, that she told

10  Mr. Falcon about the money that Project New Hope had paid

11  Falcon Transport.  That testimony was directly contradicted,

12  your Honor, by Mr. Falcon's own testimony.  He testified she

13  never told him anything about it and he never heard anything

14  about any money going into that account.

15       Again, I have to rely on your Honor.  I submit

16  Mr. Falcon was more credible, that he was the more credible

17  witness and that she was not telling the truth.

18       But most important, your Honor, Ms. Duarte testified

19  that she did not create a false invoice for SND in response to

20  this e-mail, the e-mail that is Exhibit 1 to my objections to

21  the presentence report, that she didn't read the e-mail and

22  didn't understand what she was responding to when she asked if

23  Ms. Sotto still wanted her to fax them.

24       And I submit to you that the jury obviously rejected

25  that testimony in convicting her of the check that corresponds

1    to that e-mail and rightly so.  The e-mail asks her to create

2    an invoice for M&C for $40,000, M&C Health Center, that is.  It

3    doesn't say, "Well, what type of equipment should go on that

4    invoice?"  It doesn't refer to any previous orders.  It just

5    said, "Date it today and make it for $40,000."

6            That's exactly what Ms. Duarte did, because the FBI

7    found the invoice.  They went and searched M&C Health Center

8    and, sure enough, there was an invoice there for $40,000 with a

9    list of medical equipment on it, all made up because SND didn't

10   sell any medical equipment.  It didn't even have a bank account

11   to buy any medical equipment.

12           So the jury properly found that Ms. Duarte was not

13   telling the truth, that she was perjuring herself, your Honor.

14           For all of those points I just described, those are

15   all material points and they're all points where she testified

16   falsely.  Nobody made her testify falsely.

17           If Mr. Norris gave her bad advice -- you know, they

18   were already hinting that he was ineffective -- we'll see.

19   Before he requested that instruction, your Honor, I talked to

20   him.  He told me he'd talked to his client.  He had a reason.

21           You asked him that question.  You asked Ms. Duarte if

22   she was comfortable.  You know, obviously, there's a mechanism

23   for bringing claims of ineffective assistance of counsel, but

24   it's not at sentencing when former counsel isn't present.

25           The point is, once she took the stand, it was easy

1   for her to understand what she was supposed to do.  Maybe the

2   tactical decisions involved were complicated, but the -- once

3   she made the decision to take the stand, what she was supposed

4   to do from there was simple:  Tell the truth.

5          It didn't involve -- it didn't require a great lawyer

6   to explain that to her.  It didn't require anybody.  She swore

7   an oath to tell the truth and she didn't do it.

8          Now, your Honor, there was also a second instance of

9   obstruction of justice.  Defense counsel argued that the Court

10  is in the best position to assess the credibility of the

11  witnesses.

12         If that's so, your Honor, I would point out that

13  Judge Altonaga did hear Ms. Duarte testify and found in her

14  order that Ms. Duarte had not testified credibly.

15         I brought with me, your Honor, a copy of the

16  transcript and Judge Altonaga's order.

17         I know that the Court can just take judicial notice

18  of the proceedings in other cases, but I really didn't know if

19  that would create the best record.

20         So what I'd like to do is offer the transcript and

21  the order, which I referred to in my objections to the

22  presentence report, as exhibits now.

23         I marked them Exhibit S-1 for the transcript.  That

24  is Ms. Duarte's September 12th, 2008, testimony, in Ms. Sotto's

25  trial -- new trial hearing.  And S-2 is Judge Altonaga's order,

```
 1    where she found that she -- Ms. Duarte was singularly

 2    unpersuasive in her testimony.

 3             THE COURT:  Any objection?

 4             MR. RODRIGUEZ-VARELA:  I would object.  I think I

 5    have -- I voiced my objection before.  I mean, it's a different

 6    proceeding.  It's not obstruction of justice in her case.

 7             Now, had the Government decided that that was false

 8    testimony, they could have charged her with a separate crime

 9    over there.

10             But to use it here for purposes of trying to convince

11    the Court that she obstructed justice, it certainly has no --

12    shouldn't -- should not be a matter to be considered in this

13    particular case.

14             I don't think it's -- it has to do with this case --

15             THE COURT:  Do you have --

16             MR. RODRIGUEZ-VARELA:  -- if you find it to be -- you

17    know, that she testified unpersuasively.

18             THE COURT:  Do you have authority for introducing

19    that into the record in this case?

20             MR. OSBORNE:  Well, your Honor, that particular

21    argument, which was not made in the objections to the -- in the

22    reply -- Mr. Norris's reply to my response to his objections --

23    but in response to that argument, I rely on the guidelines

24    3C1.1, Application Note 4-B, which is giving examples --

25             MR. RODRIGUEZ-VARELA:  One second, please.  I'm
```

1    sorry.

2              MR. OSBORNE:  Sure.  Of course.

3              MR. RODRIGUEZ-VARELA:  3C1.1?

4              MR. OSBORNE:  3C1.1, the commentary.

5              MR. RODRIGUEZ-VARELA:  Which application note?

6              MR. OSBORNE:  Application Note 4-B.

7              MR. RODRIGUEZ-VARELA:  Okay.  Thank you.

8              MR. OSBORNE:  Note 4 is examples of covered conduct,

9    examples of types of conduct to which this adjustment applies.

10             And it states in 4-B as one of those examples,

11   "Committing, suborning or attempting to suborn perjury,

12   including during the course of a civil proceeding, if such

13   perjury pertains to conduct that forms the basis of the offense

14   of conviction."

15             In addition, the text of the adjustment itself

16   doesn't refer only to obstruction of justice in the Defendant's

17   own case, but it says the adjustment is appropriate if the

18   Defendant obstructed justice with respect to the investigation,

19   prosecution or sentencing of the instant offense.

20             So what the Defendant did -- and, again, if it can

21   include civil proceedings where the perjury pertains to the

22   conduct, then surely it can include other criminal proceedings

23   where the testimony pertains to the conduct.

24             The Defendant certainly knew that the Government was

25   investigating her activities because she'd been interviewed in

```
 1    2006 about them.  Ms. Sotto had been convicted already by a

 2    jury of laundering money for the same thing that Ms. Duarte

 3    did.  And she showed up and was asked questions about this same

 4    conduct that she was charged with shortly afterwards.

 5            THE COURT:  And her testimony was about what?

 6            MR. OSBORNE:  Her testimony, your Honor, was really

 7    about the same thing that she testified to at trial.  Ms. Sotto

 8    was arguing that she, Ms. Sotto, had not known that the money

 9    was proceeds of any crime and that she, Ms. Sotto -- if she had

10    been given the report of the interview that I conducted of

11    Ms. Duarte in 2006, that she would have called Ms. Duarte as a

12    witness at her trial -- at Ms. Sotto's trial, that is -- and,

13    therefore, that by not turning over that report, that I had

14    violated *Brady*.

15            And so Ms. Duarte came and testified about the

16    transactions that were not -- not about SND, your Honor,

17    because we didn't charge Ms. Sotto with anything to do with SND

18    or Research Center of Florida, and we didn't know anything

19    about it at the time we indicted her.

20            But Ms. Sotto was convicted just of laundering money

21    through Falcon Transport and through -- well, she was convicted

22    of several different companies.  But Falcon Transport and

23    24-Hour Network Solutions were the only ones that were also

24    involved in this case.  And then Ms. Sotto was also convicted

25    of laundering money through two other companies not involved
```

```
 1   here.

 2           THE COURT:  I'm going to deny the admission of it

 3   into the record here, based upon the language of 3C1.1, which

 4   is that if the Defendant willfully obstructed or impeded or

 5   attempted to obstruct or impede the administration of justice

 6   with respect to the investigation, prosecution or sentencing of

 7   the instant offense of conviction.

 8           So I find that that language -- I understand what the

 9   application note states as far as the civil proceeding.  But

10   that might be a civil proceeding that relates directly to the

11   offense of conviction.

12           So I'm going to read it narrowly, as I find I should

13   read it narrowly, and that it would have to relate to the

14   investigation, prosecution or sentencing of the instant offense

15   of conviction, meaning the indictment that was filed against

16   her in the case before me.

17           But I will consider her testimony on the stand in the

18   case before me.

19           MR. OSBORNE:  Very well, your Honor.

20           THE COURT:  If you want to have it marked for

21   appellate purposes as an exhibit, that -- I have not reviewed

22   neither the transcript of the testimony by Ms. Duarte before

23   Judge Altonaga, nor have I seen the order.

24           MR. OSBORNE:  Very well, your Honor.

25           I think that covers, then, all of the objections that
```

1    the defense raised, your Honor.  I believe your Honor should

2    deny all of those objections and calculate the guidelines as

3    specified in the presentence report.

4           I also made a motion, your Honor, for an upward

5    departure.  I don't know if your Honor wants me to address that

6    now.

7           THE COURT:  Let's wait for that until I adopt the

8    report.  And then Mr. Rodriguez can make his 3553(a) arguments

9    and you can make your motion for upward departure.

10          MR. OSBORNE:  Thank you, your Honor.

11          THE COURT:  Anything further, Mr. Rodriguez?

12          MR. RODRIGUEZ-VARELA:  Your Honor, just one small

13   detail.

14          You know, I'm clearly not trying to, you know, ask

15   the Court to make any findings as to ineffective assistance of

16   counsel at this point.  I know that that is a separate

17   procedure, and I'm not trying to address that now.

18          What I am suggesting to the Court -- and I guess

19   maybe I didn't know how to articulate it earlier -- is it's

20   difficult to make a finding of perjury with regards to the

21   statements made by a defendant from the stand when the jury has

22   considered not just the evidence that the Government has

23   provided, but also the idea and the testimony that admittedly

24   has helped the Government in terms of the Defendant getting on

25   the stand and basically admitting to looking the other way.

40

1              It's hard to say whether the jury convicted her

2     because of that that the Government has brought forward or

3     because of her own admission that she looked the other way and

4     in conjunction with the instruction that was given as to

5     deliberate ignorance.

6              So while, in many cases, it may be easier to make

7     that decision, that assessment, in this particular case, we

8     don't know which -- whether what the client said when she took

9     the stand and the instruction that was given carried the day

10    for the Government or whether the Government in their case in

11    chief without the testimony of the Defendant would have carried

12    the day.

13             So with that in mind, I'll leave it there.

14             Obviously, you know, the Defendant was nervous when

15    she testified.  I think that, you know, it's not easy to get up

16    there and testify.  It's hard to hold up to a masterful

17    cross-examination, a very, very competent cross-examination, as

18    I told Mr. Osborne.

19             I felt it had been -- I thought it would be -- the

20    Defendant clearly, at her level of sophistication -- I don't

21    think she would have been able to hold up to that, particularly

22    with the idea of willful ignorance and the instruction that was

23    given.

24             Judge, could I have a moment to speak with the

25    family?

1          THE COURT:  Sure.

2          MR. RODRIGUEZ-VARELA:  Thanks.

3          (Discussion had off the record between counsel and

4    the courtroom spectators.)

5          THE COURT:  Mr. Rodriguez.

6          MR. RODRIGUEZ-VARELA:  Your Honor, thank you.

7          THE COURT:  I'm going to deny the Defendant's

8    objections.

9          In regard to the first objection, which is the amount

10   of funds that she should be held accountable for -- in

11   Paragraph 62, under 2S1.1(a)(2) of the guidelines and the

12   corresponding table and 2B1.1, I find that the probation

13   officer's estimation that the value of the funds was more than

14   $400,000, but not more than a million dollars, is correct; and,

15   therefore, the base offense level is 22 under 2B1.1(b)(1)(H).

16         And I base this ruling upon two separate lines of

17   findings:

18         First of all, as to her direct involvement, after the

19   e-mail, which is Exhibit 1 to the Government's response and was

20   an exhibit received in evidence at the trial -- and this is the

21   e-mail from Diana Sotto to Scarlet Duarte on August 13th in

22   which Diana Sotto states to Scarlet Duarte, "Please make an

23   invoice" -- and this is in quotes -- "Please make an invoice

24   for M&C Health Center dated today for $40,000 even....  They

25   will be arriving here in an hour.  So if you want to fax me the

 1   other ones with this one, that would be cool.

 2           "D, when you are ready, call me on the cell so I can

 3   stand by the fax machine" and then Scarlet Duarte responds -- I

 4   believe it was several hours later -- "Do you still want me to

 5   fax them or just take them with me?"

 6           And a false invoice is created for M&C and then

 7   processed through -- it was cashed through SND.  Correct?  The

 8   M&C invoices involved checks cashed through SND?

 9           MR. OSBORNE:  There was an invoice for $40,000 dated

10   August 13, 2004, your Honor, and there was also a check.  It

11   was Check 1068 from M&C's bank account written to SND Medical

12   Services for $40,000.

13           THE COURT:  And the 40,000-dollar check written to

14   SND on the M&C account was fraudulent Medicare monies being

15   laundered through SND.

16           So subsequent to the e-mail, as the prosecutor

17   indicated, the checks cashed after the e-mail for SND totaled a

18   little over 400,000.

19           In addition, the Defendant opened the La Bamba

20   account, and I believe she testified that she opened it so they

21   could cash checks when they didn't have a bank account or in

22   advance of opening the bank account.

23           The true intent and purpose of opening this La Bamba

24   account was to launder their monies through the cashing of SND

25   checks through La Bamba.  And there were many checks that were

1    processed through this account.  For M&C Health Center, Duarte

2    used SND Medical Services to launder $164,769.50.

3           And in Paragraph 44 of the revised advisory

4    presentence investigation report, the last sentence says,

5    "Duarte laundered $348,033.33 for Research Center of Florida

6    using SND Medical Services."

7           So SND Medical Services was utilized to cash checks,

8    to launder checks from many corporations.  And La Bamba Check

9    Cashing, where they had, quote-unquote, an account was utilized

10   to cash the checks.

11          So on that direct involvement theory, I find that she

12   should be held accountable -- that it was reasonably

13   foreseeable for her to be held accountable for all of the

14   checks cashed through SND.

15          Turning now to 1B1.3, relevant conduct, (a), which

16   indicates that the base offense level shall be determined on

17   the basis of the following:

18          1B:  "In the case of a jointly undertaken criminal

19   activity, a criminal plan, scheme, endeavor or enterprise

20   undertaken by the Defendant in concert with others, whether or

21   not charged as a conspiracy, all reasonably foreseeable acts

22   and omissions of others in furtherance of the jointly

23   undertaken criminal activity."

24          And Application Note 2 under 1B1.3 states, "A jointly

25   undertaken criminal activity is a criminal plan, scheme,

1   endeavor or enterprise undertaken by the Defendant in concert

2   with others, whether or not charged as a conspiracy.

3          "In the case of a jointly undertaken criminal

4   activity, Section (a)(1)(B) provides that a defendant is

5   accountable for the conduct, acts and omissions of others that

6   was both in furtherance of the jointly undertaken criminal

7   activity and" -- that's one -- "and, two, reasonably

8   foreseeable in connection with that criminal activity.

9          "In order to determine the Defendant's accountability

10  for the conduct of others under Subsection (a)(1)(B), the Court

11  must first determine the scope of the criminal activity the

12  particular Defendant agreed to jointly undertake, that is, the

13  scope of the specific conduct and objective embraced by the

14  Defendant's agreement."

15         And here, the Defendant was charged in Count 17 with

16  conspiracy to commit money laundering with Miguel Libera,

17  Rechart Garcia and others known and unknown to the grand jury,

18  to conduct financial transactions which involved the proceeds

19  of a specified unlawful activity, healthcare fraud, knowing

20  that the property involved in the financial transaction

21  represented the proceeds of some form of unlawful activity and

22  knowing that the transaction was designed, in whole and in

23  part, to conceal and disguise the nature, the location, the

24  source, the ownership and the control of the proceeds of the

25  specified unlawful activity, in violation of Title 18,

1  Section 1956(a)(1)(B)(1).

2        So here, I find that the scope of the criminal

3  activity that Scarlet Duarte agreed to jointly undertake was

4  the creation and operation of various corporations, shell

5  corporations, corporations by nominee owners and businesses to

6  conceal and disguise the healthcare fraud and the proceeds from

7  healthcare fraud being conducted by Diana Sotto and Miguel

8  Libera, Rechart Garcia and others.

9        "The conduct of others that was both in furtherance

10  of and reasonably foreseeable in connection" -- I'm reading

11  now.  Strike that.

12        Going back to Application Note 2 of 1B1.3, "The

13  conduct of others that was both in furtherance of and

14  reasonably foreseeable in connection with the criminal activity

15  jointly undertaken by the Defendant is relevant conduct under

16  this provision."

17        So here, I find that the Defendant should be held

18  responsible for the conduct of other persons involved in the

19  conspiracy to cash checks and receive proceeds of healthcare

20  fraud and to conceal the nature and to disguise the nature of

21  that criminal activity.

22        And that is demonstrated by the creation of these

23  various accounts, the creation of corporations, the opening of

24  the SND account at La Bamba, which was for the sole purpose of

25  cashing checks that were the proceeds of Medicare fraud.

1          Therefore, she should be held accountable for the

2    conduct not only of herself, but other persons, as it was

3    reasonably foreseeable to her and it was reasonably foreseeable

4    in connection with the criminal activity that was jointly

5    undertaken by the Defendant and the other persons charged in

6    the indictment as well as Diana Sotto and others known and

7    unknown.

8          It was reasonably foreseeable to this Defendant, to

9    Scarlet Duarte, that the account at La Bamba would be utilized

10   not only for the checks that she was directly involved in, but

11   for other checks through SND to be cashed as laundering the

12   proceeds and concealing the proceeds of Medicare fraud.

13         It was reasonably foreseeable to Scarlet Duarte that

14   the other corporations, including Falcon Transport, 24-Hour and

15   MD Billing, would be utilized for the concealment and

16   distribution of proceeds of Medicare fraud by both herself and

17   by the other persons involved in the conspiracy, including

18   those charged in Count 17, Diana Sotto and others known and

19   unknown to the grand jury.

20         So I find that the base offense level of 22 is the

21   correct base offense level, based upon the amount and value of

22   the funds that the probation officer found was attributable to

23   this Defendant, including the $54,000 in Counts 19 and 20.

24         I'm also going to deny the objection as to the

25   two-level increase for 2S1.1(b)(3), sophisticated money

1    laundering, in Paragraph 64.

2           Based upon the evidence introduced at trial, this

3    Defendant, Scarlet Duarte, utilized three shell corporations --

4    SND Corporation, Falcon and 24-Hour Network Solutions -- to

5    accomplish money laundering and conceal and disguise the nature

6    of Medicare fraud proceeds.

7           She also used a nominee owner in the setup and

8    creation of Falcon Transport, a corporation that she and Diana

9    Sotto created and put her stepfather in as the nominee owner so

10    that he could provide transportation for Medicare patients,

11    something that never happened.  This was never an operational

12    corporation.

13           She wrote checks on the SND account to third parties

14    who were totally unrelated to this operation and had those

15    persons cash the checks to disguise and conceal the Medicare

16    fraud monies that were being delivered to various fraudulent

17    clinics so that it would not be discoverable and that the

18    proceeds could be distributed.

19           In addition, there was at least a check written to

20    one other company.

21           So based upon that and the application note of 2S1.1,

22    which clearly states that sophisticated laundering typically

23    involves the use of fictitious entities, shell corporations and

24    two or more levels, that is, layering of transactions,

25    transportation, transfers or transmissions involving criminally

1    derived funds that were intended to appear legitimate.

2         And that's exactly what happened here.  There were

3    fictitious entities.  There were shell corporations.  There

4    were nominee owners.  And there was layering of transactions,

5    monies being transferred from the fraudulent clinics to SND and

6    24-Hour Network and other corporations.

7         And then, at least in the case of SND, then checks

8    were written to third parties who were totally not involved in

9    this operation, and the evidence was that they were approached

10   and asked if they would go and cash a check, which they did.

11        And so, therefore, this clearly and squarely falls

12   within the sophisticated laundering under 2S1.1(b)(3).

13        I also find that, based upon the Defendant's

14   testimony at this trial, that there should be a two-level

15   increase for obstruction of justice under 3C1.1, as indicated

16   in Paragraph 67.

17        This Defendant chose to take the stand and testified

18   falsely concerning the fact that she didn't read the e-mail.

19   She stated on the stand -- which is Exhibit 1 attached to the

20   Government's response, and that's the e-mail regarding the

21   preparation of a false invoice for M&C.

22        She then went on to say that very often she's been

23   reprimanded in her various jobs because she didn't read the

24   e-mail.

25        Well, the e-mail itself clearly indicates that she

 1    read the e-mail and that she was testifying falsely about it.

 2          She testified falsely about the reason for opening

 3    the La Bamba account, to cash checks, and indicated that this

 4    was sort of a temporary situation until they would get a bank

 5    account for SND.  That was not true.

 6          The reason for the opening of the account at La Bamba

 7    was so that Medicare fraud checks could be laundered and

 8    concealed and cashed and the proceeds of Medicare fraud

 9    distributed without being able to trace it.

10          She testified falsely about the reason for setting up

11    the Falcon Transport corporation and what she knew about the

12    opening of the Falcon Transport corporation, the setup of it

13    involving her stepfather, what he knew, what she knew, what it

14    was all about.  She testified falsely about that as well.

15          She testified that she didn't really know and wasn't

16    present when Diana Sotto asked her stepfather, Mr. Falcon, to

17    open Falcon Transport.  She testified that she was under the

18    understanding that this was a legitimate patient transport

19    business, when it was quite clear that this was not for the

20    purpose of transporting patients.

21          She testified falsely about her knowledge about the

22    various monies that were deposited into the Falcon Transport

23    accounts, including a 75,000-dollar investment from Project New

24    Hope.

25          Basically, this Defendant, when she testified,

1    attempted to rewrite history as to her knowledge and

2    involvement in this large-scale money laundering conspiracy,

3    indicating that she was uninvolved.

4           I find that she testified falsely throughout her

5    testimony, including those areas that I specifically

6    referenced.

7           So on that basis, I will deny all of the objections

8    and I will adopt the factual findings and guideline

9    applications as contained in the revised advisory presentence

10   investigation report.

11          Before going further, I would ask counsel to review

12   with me the major calculations in the revised advisory

13   presentence investigation report.

14          Let me just make -- before I go through that with

15   you, I specifically find that this sentencing hearing

16   concerning the conviction of Scarlet Duarte of the superseding

17   indictment is not the appropriate forum for there to be any

18   determination of the effectiveness or ineffectiveness of her

19   counsel, though I will note for the record, as I recall, that I

20   colloquied the Defendant both before she testified as to a

21   waiver of her Fifth Amendment rights and whether she was

22   satisfied with her attorney and I colloquied her prior to and

23   at the time that her lawyer requested the deliberate ignorance

24   instruction and whether that was her decision and whether she

25   was satisfied with her lawyer.

```
 1              But that's for another proceeding.

 2              And I only bring it up because counsel for the

 3     Defendant brought it up at this hearing.

 4              So let's review the calculations in the revised

 5     advisory presentence investigation report.

 6              The offense level is 28; the criminal history

 7     category is Roman numeral I; the advisory guideline range is

 8     78 to 97 months' incarceration, two to three years' supervised

 9     release, a potential fine of $12,500 to $3,941,346; and $100

10     special assessment as to each count of conviction, for a total

11     of $600.

12              Is that correct in its totality?

13              MR. OSBORNE:  Yes, your Honor.

14              MR. RODRIGUEZ-VARELA:  Yes, Judge.

15              THE COURT:  Ms. Duarte, you're in court today to

16     receive your sentence.  Before that happens, I must ask you if

17     there's any legal cause as to why the sentence of the law

18     should not be pronounced upon you.

19              THE DEFENDANT:  No.

20              THE COURT:  No legal cause having been shown as to

21     why sentence should not be imposed, the Court will consider

22     whatever you may wish to say in mitigation.

23              Mr. Rodriguez?

24              MR. RODRIGUEZ-VARELA:  Thank you very much, your

25     Honor.
```

1            It's a tough position, obviously, to be here in a

2     situation such as this.  I see the Court knows the case very

3     well.

4            I don't know that -- and it was the opinion of at

5     least one of the witnesses who testified that Scarlet was used

6     for this.  Whether she was willing to admit it on the stand,

7     whether she was willing to admit it by way of plea or whatever

8     is another thing.

9            But that she is somehow less culpable than

10    Ms. Sotto -- I think that's -- I think that that -- that would

11    be an appropriate thing to say.

12           To say that Ms. Sotto was in the driver's seat in

13    terms of the conspiracies to commit healthcare fraud, in terms

14    of the billing that was being done, that she was the mastermind

15    of that, I think that's probably appropriate, together with her

16    friends and her associates who were the various owners of the

17    different companies.

18           When we view this, it's not just a money laundering

19    conspiracy.  This is a healthcare fraud conspiracy that has an

20    element of money laundering.

21           Research Center of Florida, M&C Health Center,

22    Project New Hope, LR Medical Center, L&B Health Center, RL&V

23    Medical Service bilked the Medicare system of millions and

24    millions of dollars, which is a horrible, horrible thing.  I

25    don't think that anybody can deny that, that it's a horrible

1    thing.  It's a very serious offense.

2            That's where the -- the main part of the crime, if

3    you will, the more powerful portion of the conspiracy.  There

4    would be no money to launder if it hadn't been for them.

5            Then you have certain people that -- because, of

6    course, you know, getting a check or a draft from the Medicare

7    system into your account is one thing.  Personally putting your

8    hands on the money is quite another.

9            And the "intelligent" people who do this -- in

10   quotations, "intelligent" -- because they're criminals, but

11   they're still intelligent -- find people like Scarlet, give her

12   a little piece of the action to do the most obviously criminal

13   part of the crime, the people akin to the ones that handle the

14   drugs, the people that internally carry the drugs in here, the

15   people who deliver drugs for major traffickers -- all those

16   people are expendable members of the conspiratorial wheel.

17           If not Scarlet, almost any other willing to sacrifice

18   their freedom, if you will, for a few dollars.

19           When you look at Scarlet's life, Scarlet was a good

20   girl.  She went to school, not unlike many other young people

21   who go to school, who try to find themselves a path through

22   life where they honorably make their money and they work hard,

23   contributed to her family, to her mom, to her dad, to her home,

24   worked hard to support the kids.

25           And all through that period of time -- I think junior

54

1    high is where she meets this girl, Ms. Sotto.

2            Now, Ms. Sotto comes from a family that has money.

3    Ms. Sotto has always had money.  Ms. Sotto doesn't have any

4    problems, any care in the world.

5            Somehow, she lets herself be preyed upon by Sotto to

6    do this.  Now, why Sotto isn't doing these things herself is

7    obvious.  She's the mastermind of the operation.  Even the

8    people that opened clinics are under the direction of Sotto.

9            The people that are -- that own these clinics, they

10   don't know what they need to bill.  They don't know what are

11   the drugs that Medicare is paying for and the drugs that

12   Medicare is not paying for.

13           If you run an HIV clinic, even though the HIV clinic

14   is false, you still need somebody that knows what are the drugs

15   that are billed through an HIV clinic because, if they start

16   billing other drugs, then, obviously, it's not going to make

17   any sense and it's going to be more easily discovered that

18   there's fraud going on there.

19           Now, those are not the duties of somebody like

20   Scarlet Duarte.  Scarlet Duarte's duties are more -- you know,

21   more of the high-risk position, you know, "You cash the checks.

22   You put your face on this.  You open the company.  You do these

23   things."

24           Now, admittedly, that helps the people who are

25   committing the fraud get their hands on the money.  But they're

1    the ones that are getting the lion's share of this.

2            It still doesn't detract from the fact that she was,

3    by accounts of people who testified and were, apparently,

4    truthful, used, used to some extent, used because of her lack

5    of intelligence, used because of her financial position, used

6    because of her needs, used because of her children's needs,

7    used because of her family's needs, but used.  That doesn't

8    exculpate her from her responsibility in this case.

9            And based on the Court's rulings and the conviction

10   on the indictments in this case and -- the Court, listening to

11   our objections, has determined that at least the 28 -- the

12   Level 28 is the appropriate level; and then that's it.  I mean,

13   there's no more discussion about that.  We accept that that's

14   the Court's findings, a Level 28, and that's it.

15           But there's certain things that that number doesn't

16   take into account.  That number doesn't take into account what

17   her life has been like before.  Obviously, she has no criminal

18   history.

19           She has always been a producing member of society, a

20   person who has worked, who despite the fact that there was some

21   separation in her family -- her dad and her mom separated --

22   and she had her children, she still maintained herself close to

23   her family.

24           Her family, as you can see, is very supportive.

25   They're all here, if not -- most of them are here today.  Her

1    father is here.  Her mother is here.  The kids are here.  It's

2    a testament to the fact that Scarlet made a mistake, a horrible

3    mistake, a huge mistake, that she's going to pay dearly for.

4    But, your Honor, inside, she is a good girl that was corrupted.

5    She didn't start out this way.

6              And I know that you often see people here crying and

7    saying, you know, "Oh, my God.  People made me do this."

8    Nobody made her do anything.  She did things on her own.

9              But the reality is that she is -- she may not qualify

10   under minor role because of how strict minor role is, but if

11   you look at her conduct, clearly, clearly, her conduct is that

12   of a person who is far less culpable than the conduct of Miguel

13   Libera, Miguel Libera, who was called to testify in this case.

14             And I think that the minute he opened his mouth, the

15   prosecutor had to pull the plug because he started saying that

16   he didn't expect that there would be any kind of a reduction or

17   anything with what he's doing.

18             Batista and Hernandez, Capdevila, people who are the

19   ones that are driving the big Mercedes-Benz on the street,

20   Judge, the ones with the 7,000-square-foot homes, the ones with

21   the 60-foot yachts in the most prestigious marinas around

22   town -- you know, we all see those people.

23             And then we see the people that are driving their Kia

24   Sorento and their -- you know, their biggest claim to fame is

25   their new Yukon where they can transport their kids and go eat

1    at McDonald's and be able to buy -- instead of the cheap

2    glasses, buy a little bit better glasses.  That is the

3    incentive for somebody like this.

4         It's not to live the grand life, because you're not

5    going to live the grand life with the meager pieces that they

6    throw to you under these conditions.

7         So I ask the Court to consider her personal history,

8    her family history, her employment history, her circumstances

9    as an individual, to consider the fact that she is not by any

10   stretch of the imagination an essential element of this

11   conspiracy.  Because, like I said before, if it wasn't Scarlet,

12   it'd be anybody else.

13        A sentence of 70, 80 months is higher than the

14   sentence that the -- than the fraudsters get in this case.

15   Sure.  They pled guilty.  They agreed to cooperate with the

16   Government.  They're smarter.  They know what they're supposed

17   to do.  So they end up with sentences that are perhaps smaller,

18   more manageable.

19        But a sentence in the 70s and the 80 months for a

20   person like Scarlet is overkill.  Scarlet is unlikely to ever

21   engage in criminal conduct again.  It would be very difficult

22   to even consider how she would not -- not be more careful about

23   the associations that she becomes involved in throughout the

24   rest of her life.

25        She is a person who is not violent, an individual

 1   that has always done well until now, until she found herself in

 2   the bottom-feeder position of this large conspiracy.

 3          Sometimes the Government files these cases

 4   separately.  They put the clinic owners over here and they file

 5   that indictment.  They put the money launderers here and they

 6   do that indictment.

 7          But, in reality, it's not two conspiracies.  We don't

 8   have a money laundering conspiracy and a healthcare fraud

 9   conspiracy.  This is a healthcare fraud conspiracy that has

10   various components, various components.

11          Scarlet never did get that Rolex.  She never did get

12   to drive that, you know, SL 500 convertible.  She never did get

13   that house in Cocoplum or Gables By the Sea.

14          She continued to struggle throughout the time she was

15   engaged in this conspiracy.  Her accounting records would

16   demonstrate that she never amassed any amounts of money to

17   speak of.

18          The kids continued to go to their regular school.

19   They -- at one point, they got better glasses.  They used to go

20   eat at McDonald's more often than they used to before, and that

21   was the outing.  The outing was to McDonald's.

22          You know, they didn't take them out on a Disney

23   cruise.  They didn't take the kids out to Vail for private ski

24   lessons.  That's the stuff of the fraudsters.  That's the stuff

25   of the guys up there.

1          We've seen them.  You've seen them.  It's not the

2     stuff of a bottom-feeder like her.

3          So sentence her like a bottom-feeder, Judge.  I urge

4     you to look upon her as I look upon people like this

5     oftentimes.  I even feel sad for them.  It's pitiful to see how

6     people ruin their lives for nothing.  And that's what happened

7     here.

8          So in the great amount of discretion that you have

9     where guidelines are advisory and sometimes cruel and sometimes

10    not necessarily fitting of the particular circumstances of

11    these cases that we see here, fashion a sentence, your Honor,

12    that punishes the Defendant, but that recognizes her particular

13    situation and the particular need to be protected from a person

14    like Scarlet Duarte.

15         Had it not been for this situation that was already

16    ongoing, Scarlet Duarte would have continued on through life

17    without committing any kind of crime.

18         And you know what?  Maybe she would have gotten that

19    Mercedes.  Maybe she would have gotten that big house, you

20    know, with a white picket fence.  Who knows?  But certainly not

21    FDC Miami.

22         So you know the discretion that you have.  I urge you

23    to exercise it and fashion a sentence that is lower than a

24    Level 28 would call for.  How much lower?  Whatever the Court

25    thinks is appropriate, if you even think it's appropriate.

```
 1              But we rely on this Court's sense of justice, and we
 2    thank you for your time this afternoon.
 3              I know that Scarlet wanted to say some things.
 4              THE COURT:  Yes.
 5              Ms. Duarte, is there something you want to say?
 6              MR. RODRIGUEZ-VARELA:  Yeah.  So we'll go ahead with
 7    that.
 8              THE COURT:  And we have an interpreter available for
 9    you, Mr. Rodriguez.
10              MR. RODRIGUEZ-VARELA:  Thanks.  It's for the mom and
11    for the dad.  You know, they don't speak English.  I'm sorry
12    about that.  I didn't consider that.  I apologize.
13              THE COURT:  We have an interpreter for you.
14              MR. RODRIGUEZ-VARELA:  Thank you so much.
15              Do you want to start with them so the interpreter can
16    go?
17              THE COURT:  It's up to you.
18              MR. RODRIGUEZ-VARELA:  Sit down.
19              Let's call the mom.
20              Where do you want her?  At the lectern?
21              THE COURT:  Yes, please.
22              MR. RODRIGUEZ-VARELA:  All I want you to do is to --
23              MS. FALCON:  Yes.  My name is Isabel Falcon.
24              MR. RODRIGUEZ-VARELA:  Ma'am, what is your name
25    again, for the record?
```

1          MS. FALCON:  Isabel Falcon.

2          MR. RODRIGUEZ-VARELA:  Ms. Falcon, how are you

3    related to Scarlet?

4          MS. FALCON:  I'm her mother.

5          MR. RODRIGUEZ-VARELA:  You and I spoke outside.  I

6    told you what, basically -- you know, you wanted to tell the

7    Court some things, and I told you to just -- I would call you

8    and let you just address the Court.

9          Remember that?

10          MS. FALCON:  Yes.

11          MR. RODRIGUEZ-VARELA:  So now is your time to talk to

12    the Judge about Scarlet, what you think is important for the

13    Judge to know about how she is and what kind of person she's

14    always been and what she means to you and the family.

15          MS. FALCON:  For me, she means my entire life.  She's

16    more than a daughter to me.  She's like my mother, because I

17    have been a person of very low culture, not much culture.  I'm

18    rather ignorant.

19          She has taken care of me.  She's been mother and

20    father to her own children.  I'd like to say that, without her,

21    perhaps my life will be shortened because, for me, she's always

22    been my right hand in every aspect.

23          MR. RODRIGUEZ-VARELA:  Are you ill?

24          MS. FALCON:  Yes.  I have problems.  I have diabetes.

25    I have kidney problems, hypoglycemia.

 1           MR. RODRIGUEZ-VARELA:  While Scarlet was out, did she

 2   help you in any way cope with those conditions?

 3           MS. FALCON:  She was the one who helped me with my

 4   diet.  She would be the one to take me to the doctor, help me

 5   in every way.

 6           MR. RODRIGUEZ-VARELA:  Now, tell the Court, do you

 7   also know Diana Sotto?

 8           MS. FALCON:  Yes, sir.

 9           MR. RODRIGUEZ-VARELA:  How did you know Diana Sotto?

10   How did she come to be known by the family?

11           MS. FALCON:  As a young girl, my daughter used to

12   attend the same school.  That's where they met.  When they met,

13   Diana had a special interest -- or developed a special interest

14   in my daughter.

15           But when I met her, I noticed what her problems were.

16   Specifically, there was one teacher who called me up to ask me

17   not to allow my daughter to continue her friendship with Diana.

18           MR. RODRIGUEZ-VARELA:  Now, did you advise your

19   daughter against maintaining a friendship with Diana?

20           MS. FALCON:  No.  Honestly, what I actually did was

21   to move away so they would not have any further contact.

22           MR. RODRIGUEZ-VARELA:  How would a lengthy sentence

23   that this Court may impose in this particular case affect you

24   and your family?

25           MS. FALCON:  It would be so hard that I'm not able to

```
 1   put it into words, honestly.

 2            MR. RODRIGUEZ-VARELA:  Do you have anything to tell

 3   the Court that is about to sentence her as to something that --

 4   you know, one thing she should consider about your daughter

 5   that stands out?

 6            MS. FALCON:  Yes, sir.

 7            MR. RODRIGUEZ-VARELA:  What is that?

 8            MS. FALCON:  What I want to make sure that you

 9   understand is that, from the very moment that my daughter

10   started back at work with Diana Sotto, my husband was out of

11   work.

12            I taught my daughter to deeply love -- how to deeply

13   love her stepmother as well as her stepfather.

14            MR. RODRIGUEZ-VARELA:  Did she help the family

15   financially during the time that your husband was out of work?

16            MS. FALCON:  No.  Forever, always, she has always

17   helped us whenever we needed it.  And I've always helped her as

18   well whenever she has needed me.

19            MR. RODRIGUEZ-VARELA:  Anything else you want to tell

20   the Court briefly?

21            MS. FALCON:  It was not my daughter who involved her

22   stepfather in this job.  It was I who asked her to find him a

23   job.

24            MR. RODRIGUEZ-VARELA:  Thank you very much.

25            MS. FALCON:  Thank you.
```

```
 1              MR. RODRIGUEZ-VARELA:  Judge, this is Mr. Duarte.

 2              How old are you, kid?

 3              MR. DUARTE:  15, sir.

 4              MR. RODRIGUEZ-VARELA:  He is -- it's not my

 5    preference to have minors address the Court in these matters.

 6    He has been very insistent in wanting to address the Court.

 7    It's not my preference.

 8              THE COURT:  It's up to you, sir.

 9              What is your name?

10              MR. DUARTE:  Hiram Anthony Duarte.

11              THE COURT:  Yes, sir.

12              MR. DUARTE:  Your Honor, I'm not here to tell you how

13    to do your job.  I don't know if anything -- any of this is

14    real or not.  But I know what I feel for my mother is real.

15         My mother's my everything.  She has been there

16    through thick and thin.  She's helped me.  She's always been

17    there.  My father never helped.  She was my life.

18              And I don't want to look like a joke to you because

19    I'm wearing my high school ROTC uniform.  I just want to show

20    you that I am a proper young man and she has raised me to be

21    this proper young man.

22         I am -- I want to show that I represent her in

23    everything she's done for me and I have done great in

24    everything I have done because she has been there to push me.

25              I have many problems in my life right now.  My mom
```

1    being away from me, now that I'm an adolescent -- that would be
2    horrible for a lengthy time, ma'am -- your Honor.  I'm sorry.
3         Your Honor, I hope you find it in your heart not to
4    give her the most lengthy time there is.  But I'm not here to
5    tell you how to do your job.
6         I'm here to show you how I feel about my mother with
7    respect to all my family, that she is single-handedly the
8    greatest person I have ever met in my life.  She's amazing.
9         (Defendant crying).
10        MR. DUARTE:  Mom, please don't cry.
11        THE COURT:  Why don't we take a break for a few
12   minutes so the Defendant can compose herself.  We'll be in
13   recess for ten minutes.
14        (Thereupon a recess was taken, after which the
15   following proceedings were had:)
16        THE COURT:  You may be seated.
17        We're back on United States of America versus Scarlet
18   Duarte, Case No. 08-20851.
19        Counsel and Probation, state your appearances,
20   please, for the record.
21        MR. OSBORNE:  Good afternoon, your Honor.
22        Marc Osborne again on behalf of the United States.
23        MR. RODRIGUEZ-VARELA:  Nelson Rodriguez-Varela on
24   behalf of the Defendant, Scarlet Duarte, who's present before
25   the Court.

1          THE COURT:  Probation, would you state your

2    appearance.

3          THE PROBATION OFFICER:  Good afternoon, your Honor.

4          Michelle Burgess on behalf of Probation.

5          THE COURT:  Yes, Mr. Rodriguez.  You're ready to

6    proceed?

7          MR. RODRIGUEZ-VARELA:  Yes, your Honor.

8          I'm ready to proceed with Ms. Duarte, who has a

9    brief -- if she can just remain seated.

10          THE COURT:  Sure.  That's fine.

11          MR. RODRIGUEZ-VARELA:  Given her situation, I want

12    her just to sit.

13          THE COURT:  That's fine.

14          MR. RODRIGUEZ-VARELA:  She wishes to address the

15    Court.  Thank you, your Honor.

16          THE DEFENDANT:  Your Honor, I am facing the position

17    of a sentence that is -- and that is a much bigger challenge

18    than any other that I have had to endure before, and I must

19    tell you that I have endured a lot.

20          I have been a child that had to overcome many

21    difficult family circumstances, circumstances that carried

22    emotional distress, perhaps many more than any of my age.

23    Therefore, I had to grow up faster.

24          I did not have an ideal childhood, but I still

25    survived.  I got married at a young age and had two beautiful

1    children.  I thought that I finally had the stability I needed

2    and wanted desperately, but it did not turn out to be the way

3    that I expected.

4           I have been able to forgive all the things and people

5    that were not up to my expectations.  I was able to heal my --

6    I have been able to heal my wounds and I have never inflicted

7    any wounds on any of my loved ones, especially my kids.

8           I have always worked very hard for them, and I have

9    been the backbone for both of my boys.

10          I've made some serious mistakes and poor choices, and

11   I hope that you understand that I never wanted to become a

12   Defendant in a court of justice.  I realize now that these

13   wrong choices have taken me far into this trouble.

14          There are many things that I would have done

15   differently if I had the opportunity, but I guess that will not

16   be possible for me now.  I cannot change the past, but I can

17   certainly change the future.

18          I do not see this court as a place of punishment, but

19   as a place of solution.  Where there is a transgression of the

20   law, a cure is needed.  As a responsible adult, I am dealing

21   with this situation honestly and, for the first time in my

22   life, with full knowledge and understanding.

23          I thank all of you, including Assistant US Attorney

24   Marc Osborne and the lead agent, Hui Nguyen, and my family, who

25   have supported me unconditionally, my attorney that has taken

1    this case under such unique circumstances, and most of all you,

2    your Honor, expecting that you could render a fair judgment.

3           I embrace the jury verdict, believing in the justice

4    of the United States and believing in your sense of justice and

5    equity.  I submit myself to your mercy and the compassion that

6    my words might have awakened in your heart.

7           I have always treated everyone with respect and

8    compassion and understanding, and I certainly hope and pray

9    that this Court treats me the same way.

10          And I ask finally, but not least, that you do -- if

11   you could find it in your heart not to separate me from my boys

12   for such an extended period of time.

13          That's all.

14          Thank you.

15          THE COURT:  What does the Government say?

16          MR. OSBORNE:  In the first place, your Honor, as I

17   mentioned, the Government is seeking an upward departure in

18   this case.  We're seeking an upward departure as authorized by

19   Sentencing Guidelines 3B1.1, Commentary Note 2.

20          That comment -- and I requested this upward

21   departure, your Honor, in my response to the objections to the

22   presentence report, and it was also noted as a possible basis

23   for upward departure in the presentence report itself.

24          That note indicates that an upward departure may be

25   applicable if the Defendant did not lead -- did not organize,

1   lead, manage or supervise another participant, but exercised

2   management responsibility over the property, assets or

3   activities of a criminal organization.

4          I think that's appropriate here, your Honor.  The

5   Defendant recruited multiple people to participate in the

6   crime -- and I use the word "participate" in the ordinary sense

7   of the word now, not the guidelines sense -- but just factually

8   got them involved, her stepfather, her friends at work who

9   cashed checks for her.

10          The Defendant was the sole signatory on two of the --

11   well, her stepfather was a signatory on the Falcon Transport

12   account, but she signed all the checks and she was the sole

13   signatory on the 24-Hour Network Solutions account.  So she was

14   in charge of the bank accounts.

15          And although she claims that everything she did was

16   at Ms. Sotto's direction, in the instances we actually have

17   witnesses to testify to it, they say that it was Ms. Duarte who

18   recruited them to cash the checks, who gave them the checks,

19   that sort of thing.

20          So we can't prove by a preponderance of the evidence

21   that any of those people were participants in this scheme.

22   And, actually, I don't -- I don't actually think they were.

23          But, nevertheless, given the role she played in

24   making it all happen and recruiting these people and directing

25   what they should be doing, then we think that upward departure

1   is appropriate, your Honor, and I recommended a two-level

2   upward departure.

3           THE COURT:  Do you have a response to the request for

4   an upward departure?

5           MR. RODRIGUEZ-VARELA:  Your Honor, I don't think

6   that, under the circumstances, an upward departure in this case

7   is appropriate.  The ends of justice could be met by a sentence

8   that the Court can fashion without regards to any upward

9   departure.

10          So I would object to that.

11          THE COURT:  I'm going to deny the Government's

12  request for an upward departure under 3B1.1 as referenced in

13  Application Note 2.

14          The application note does reference someone who is

15  not an organizer, leader or manager, supervise another

16  participant, which is required for an increase in the levels

17  under 3B1.1.

18          The application note goes on to say, "but who,

19  nevertheless, exercised management responsibility over the

20  property, assets or activities of a criminal organization."

21          First of all, I recognize that I have the discretion

22  to upwardly depart.  I find it's a close call as to whether,

23  under the facts and circumstances of this case, this Defendant

24  exercised management responsibility over the property, assets

25  or activities of a criminal organization.

1          She was certainly a full and willing participant.

2    I'm just not convinced that the underlying facts of this case

3    are indicative of management responsibility and, if there was

4    management responsibility, that it is of such an extent that I

5    would find that an upward departure is warranted, though I do

6    find it's a close call.

7          But I don't find that it's warranted.  I think that,

8    in looking at the other sentences in this case and the 3553(a)

9    factors as well, that I don't find it would be warranted or

10   appropriate in this case, based upon the underlying facts.

11         If you would, stand with your client, please.

12         In a few weeks, I will have been on the federal bench

13   for 14 years.  In these 14 years, I've sentenced on the average

14   of about two or three people a day, 50 weeks a year, for

15   14 years.

16         It is the hardest part of my job.  It's always very

17   difficult because it is always very sad.  There are many, many

18   victims involved in all of the defendants that I sentence, and

19   this case is no exception.

20         Ms. Duarte, in your statement to me, you indicated

21   that you felt that you had not wounded any members of your

22   family, especially your children.  I think you're going to have

23   to think about that statement --

24         THE DEFENDANT:  May I --

25         THE COURT:  -- because -- yes, ma'am.

1          THE DEFENDANT:  What I meant to say was I have never

2    wounded.  I had never wounded.  Maybe I read it incorrectly.

3    But I had never wounded.

4          MR. RODRIGUEZ-VARELA:  You mean before?

5          THE DEFENDANT:  Right.  I had never wounded --

6          THE COURT:  Before this time?

7          THE DEFENDANT:  Right.  Right.  I had never

8    wounded --

9          THE COURT:  Because I think that your children are

10   very wounded by this.

11         THE DEFENDANT:  Definitely.  I agree with you.

12         THE COURT:  The fact that they are not going to know

13   their mother's touch or guidance for a period of time during

14   very impressionable years -- and it seems that there's not,

15   from what your son said, a tremendous amount of influence from

16   their father in their lives.

17         It is indeed very sad.  And I thought that your son

18   spoke, as I'm sure you did -- that he spoke beautifully.  He

19   spoke from the heart.  It's not easy for a 15-year-old to get

20   up and say, "I've got problems and I'm trying to deal with

21   them" and how much my mom means to me under these

22   circumstances.

23         I always find it extremely sad that the persons who

24   come before me -- and this Defendant is no exception -- only

25   begin to realize what is so important in their lives when they

1    have hit this rock bottom.  One would have hoped that a single

2    mom trying to provide a good home for her children might have

3    said, "I'm not going to be involved in this because my children

4    are so much more important to me than obtaining money in this

5    fraudulent way and being part of this."

6          And I don't know -- I have wondered over these

7    14 years what possesses people to go down the road and to open

8    the doors of criminal conduct.  Is it the money -- the easy

9    money?  The thrill of getting away with something?  The peer

10   pressure?

11         I know that it is always very sad, and this case is

12   no exception.

13         I think, in the case of Medicare fraud, which is such

14   a serious, serious offense at this time in our country, where

15   healthcare of all persons, but especially the elderly and

16   disabled, are of such concern to our society as a whole, this

17   culture of which this Defendant became a member, this culture

18   has grown and developed in Miami of persons who think they

19   deserve to steal money from the Government that is meant to

20   give healthcare for the elderly and disabled, persons not

21   unlike your own mother.

22         And there are so many levels.  This has become such a

23   huge criminal industry in Miami.  Yes.  There are the people

24   involved in the clinics.  There are the people involved in the

25   billing.  There are the people like this Defendant involved in

```
 1    the money laundering to hide the assets and distribute the

 2    assets.  It is one big free-for-all.

 3              And not one person, not Scarlet Duarte, not Miguel

 4    Libera, not Rechart Garcia, not Diana Sotto -- not one person

 5    says, "Wait a minute.  What am I doing here?  Is this money

 6    worth it?  Do I want to take a chance to spend time in jail?

 7    Should I be stealing from the Federal Government monies that

 8    are meant to help people with their health?"

 9              Can there be anything that is really much worse than

10    taking money from people who need it for their health, from the

11    disabled to buy a car, to buy a school uniform, to be part of

12    the gang?  And if for no other reason than to not wound your

13    own family and your own children.

14              The Defendant has asked me -- at one point, he asked

15    for the lowest end of the guidelines -- defense counsel -- And

16    he has asked for a downward variance.  And I don't find that a

17    downward variance is appropriate in this case either.

18              The Eleventh Circuit in *United States versus Pugh* set

19    forth a procedure for a sentencing court to follow -- and *Pugh*

20    is reported at 515 F.3d 1179, a 2008 decision -- a procedure

21    for a sentencing court to follow when there is a request for a

22    downward variance.

23              And the *Pugh* court, first of all, found, as does this

24    Court, that pursuant to *Kimborough* and *Booker* and *Gall* and

25    other Supreme Court case law, that the sentencing guidelines
```

 1    are advisory.  The Court is not bound by them.  The Court must

 2    consult them, take them into account, but they are advisory.

 3          The procedure the Court must follow is to first

 4    correctly calculate the guidelines and then give both parties

 5    an opportunity to argue for whatever sentence they deem

 6    appropriate and then the Court should consider the 3553(a)

 7    factors to determine whether they support the requested

 8    sentence.

 9          Under 3553(a), the Court is to consider the nature

10    and circumstances of the offense and the history and

11    characteristics of the Defendant as well.  As I've indicated,

12    the nature and circumstances of the offense is a very

13    serious -- these are very serious offenses.

14          The money laundering, conspiracy and substantive

15    offenses concerning monies stolen from Medicare have such a

16    huge impact in our country today, not only as they directly

17    affect so many people who are struggling for healthcare, but

18    our community and our society as a whole that is struggling

19    with, "How do we provide healthcare?  What are the

20    responsibilities of Government?"

21          And here, we have a program that a large number of

22    people have decided is money that's there for the taking for

23    them, for their own personal purposes.

24          The history and characteristics of the Defendant:

25    The Defendant has no prior criminal history.

1           The Court also has to consider the need for the

2    sentence imposed to reflect the seriousness of the offense, to

3    promote respect for the law and provide just punishment, to

4    afford adequate deterrence to criminal conduct, to protect the

5    public from further crimes of the Defendant, the need to avoid

6    unwarranted sentencing disparities among Defendants with

7    similar records who have been found guilty of similar conduct

8    and the advisory guidelines.

9           When I consider the need for the sentence in this

10   case to reflect the seriousness of the offense, to promote

11   respect for the law and to afford adequate deterrence to

12   criminal conduct, it is not just adequate deterrence to

13   criminal conduct of this Defendant, but adequate deterrence to

14   criminal conduct for those other members of our community who

15   feel that being involved in healthcare fraud and the laundering

16   of monies of healthcare fraud is something that they should

17   participate in.

18          I find that, in order to effect both just punishment

19   and the need for the sentence in this case to reflect the

20   seriousness of the offense, that a sentence of 97 months, which

21   is the highest end of the advisory guidelines, is just.  It is

22   warranted by the conduct of the Defendant and her involvement

23   in this case.

24          I hope it will serve as adequate deterrence by this

25   Defendant and others that Medicare fraud -- if convicted of

1    Medicare fraud, persons who stand before this Court will be

2    dealt with very seriously.  It is a long time.  It is eight

3    years and one month in prison, eight years where this Defendant

4    will not be there for her children.

5              The Court has considered the statements of the

6    parties, the revised advisory presentence investigation report,

7    which contains the advisory guidelines and the statutory

8    factors set forth in Title 18, United States Code,

9    Section 3553(a)(1) through (7).

10             It is the finding of the Court that the Defendant is

11   not able to pay a fine and, therefore, no fine shall be

12   imposed.

13             Pursuant to the Sentencing Reform Act of 1984, it is

14   the judgment of the Court that the Defendant, Scarlet Duarte,

15   is hereby committed to the custody of the United States Bureau

16   of Prisons to be imprisoned for 97 months.

17             This term consists of 97 months as to each of

18   Counts 17, 18 through 20, 26 and 27, to be served concurrently.

19             Upon release from imprisonment, the Defendant shall

20   be placed on supervised release for a term of three years.

21   This term consists of three years as to all counts, all such

22   terms to run concurrently.

23             Within 48 hours of release from the custody of the

24   United States Bureau of Prisons, the Defendant shall report in

25   person to the probation office in the district to which she is

1    released.

2         While on supervised release, the Defendant shall not

3    commit any federal, state or local crimes; she shall be

4    prohibited from possessing a firearm or other dangerous device;

5    she shall not possess a controlled substance; she shall

6    cooperate in the collection of DNA and shall comply with the

7    standard conditions of supervised release that have been

8    adopted by this Court and with the following special

9    conditions:

10        The Defendant shall obtain prior written approval

11   from the Court before entering into any self-employment.

12        The Defendant shall submit to a search of her person

13   or property conducted in a reasonable manner and at a

14   reasonable time by the United States probation officer.

15        One moment, please.

16        The Defendant shall maintain full-time legitimate

17   employment and not be unemployed for a term of more than

18   30 days unless excused by the United States probation officer.

19        The Defendant shall provide documentation, including,

20   but not limited to, pay stubs, contractual agreements, W-2 wage

21   and earning statements and other documents requested by the

22   United States probation officer.

23        The Defendant shall not be engaged in any business

24   that has any contact, whether directly or indirectly, with the

25   medical field or insurance, whether it be private insurance or

1    governmental insurance, including Medicare or Medicaid.

2              It is further ordered that the Defendant shall pay a

3    special assessment of $100 as to each of Counts 17, 18 through

4    20, 26 and 27, for a total of $600, which shall be due

5    immediately.

6              I also find that this sentence at the highest end of

7    the advisory guideline range avoids unwarranted sentencing

8    disparities for defendants with similar records and similar

9    conduct.

10             Ms. Duarte, it is my duty to inform you that you have

11   ten days with which to appeal the judgment and sentence of this

12   Court.

13             Should you desire to appeal and be without funds with

14   which to prosecute an appeal, an attorney will be appointed to

15   represent you in connection with that appeal.

16             Should you fail to appeal within that ten-day period,

17   it will constitute a waiver of your right to appeal.

18             It is also my duty to elicit from counsel from both

19   sides fully articulated objections to the Court's finding of

20   facts and conclusions of law as announced at this sentencing

21   hearing and to further elicit any objections which either side

22   may have to the manner in which sentence was imposed in this

23   case.

24             Are there any objections from the Government?

25             MR. OSBORNE:  No, your Honor.

```
 1              THE COURT:  From the Defendant?

 2              MR. RODRIGUEZ-VARELA:  No, Judge.

 3              THE COURT:  The marshal will execute the sentence of

 4   the Court.

 5              MR. RODRIGUEZ-VARELA:  Judge, may I address one other

 6   issue?

 7              THE COURT:  Yes.

 8              MR. RODRIGUEZ-VARELA:  I was allowed to enter this

 9   case for purposes of sentencing, and I filed my notice of

10   appearance for purposes of sentencing.

11              Now the Defendant may need to file a notice of appeal

12   and may need to prosecute her appeal.

13              I think that the Court will need to inquire of her, I

14   guess, or someone will need to inquire of her regarding funds

15   to hire a lawyer or impose perhaps CJA counsel for purposes of

16   appeal.

17              I can always file the notice for her so we

18   don't waive anything.

19              THE COURT:  I think you're responsible for filing the

20   notice of appeal.

21              MR. RODRIGUEZ-VARELA:  I will do that.  I will do

22   that.

23              THE COURT:  I had found her to be indigent for costs.

24   Correct?

25              MR. RODRIGUEZ-VARELA:  Yes.  I think -- yes, you had.
```

```
 1              THE COURT:  And she had prior CJA counsel.

 2              MR. RODRIGUEZ-VARELA:  She did.

 3              Norris was CJA?

 4              THE DEFENDANT:  Yes.

 5              MR. RODRIGUEZ-VARELA:  Yes.

 6              THE COURT:  Do you have money, ma'am, for -- let's

 7    place her under oath, please.

 8              (Whereupon, the Defendant was duly sworn.)

 9              THE COURT:  Do you have money to hire an attorney for

10    an appeal -- to prosecute an appeal for you, ma'am?

11              THE DEFENDANT:  I don't.

12              THE COURT:  Do you have any money in the bank, own

13    any property or a car?

14              THE DEFENDANT:  The cars are financed, and I don't

15    own a property.

16              THE COURT:  I'll appoint counsel to prosecute an

17    appeal for her.

18              Mr. Rodriguez, you're appointed.

19              MR. RODRIGUEZ-VARELA:  I'm not on the CJA panel.

20              THE COURT:  You're not on the CJA panel?

21              MR. RODRIGUEZ-VARELA:  I'll accept your appointment,

22    but I'm not on the CJA panel.

23              THE COURT:  You're not on the CJA panel?

24              MR. RODRIGUEZ-VARELA:  No, your Honor.  I never have

25    been.
```

1            THE COURT:  I didn't realize that.

2            So, then, I will pick appellate counsel from the CJA

3     panel.

4            MR. RODRIGUEZ-VARELA:  Thank you.

5            THE COURT:  You are responsible for filing the notice

6     of appeal.

7            MR. RODRIGUEZ-VARELA:  I will do so, your Honor.

8     Thank you.

9            THE COURT:  The marshal will execute the sentence of

10    the Court.

11           We're in recess.  Thank you.

12           (Proceeding concluded.)

13

14                  C E R T I F I C A T E

15

16           I hereby certify that the foregoing is an accurate

17    transcription of the proceedings in the above-entitled matter.

18

19

20    _____          /s/Lisa Edwards
          DATE               LISA EDWARDS, CRR, RMR
21                           Official United States Court Reporter
                             400 North Miami Avenue, Twelfth Floor
22                           Miami, Florida 33128
                             (305) 523-5499
23

24

25